**IN THE UNITED STATES DISTRICT COURT.**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

KAY RINEHART STAHL                           §

VS.                                          §    CIVIL ACTION NO. 5:21cv22-RWS-JBB

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION                      §

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

On February 24, 2021, Kay Stahl ("Plaintiff") initiated this civil action pursuant to the Social Security Act ("The Act"), Section 405(g) for judicial review of the Commissioner's denial of Plaintiff's applications for Social Security benefits. The Court is of the opinion that the above-entitled Social Security action should be **AFFIRMED.**

## HISTORY OF THE CASE

On March 18, 2019, Plaintiff protectively filed an application for a period of disability and disability insurance benefits, alleging disability beginning January 27, 2018 (Dkt. No. 14, "Tr." 10). Plaintiff reported she was unable to work due to anxiety disorder, depression, panic attacks, chronic neck pain, and carpel tunnel-related symptoms in her hands and arms (Tr. 40). The Commissioner denied Plaintiff's application initially and upon reconsideration (Tr. 77, 94). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). Pursuant to Plaintiff's request, an ALJ held a hearing on August 13, 2020, where Plaintiff, her attorney, and a vocational expert testified (Tr. 35-63). On October 20, 2020, the ALJ issued a decision, finding Plaintiff not disabled (Tr. 10-30).

Plaintiff requested review of the ALJ's decision. On January 15, 2021, the Appeals Council denied Plaintiff's request for review (Tr. 1-6), making the ALJ's decision the Commissioner's

final decision for purposes of the Court's review. Plaintiff now seeks review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF THE FACTS

### Age, education, and past work experience

Plaintiff was fifty-two years of age at the time of the hearing (Tr. 41). She has a bachelor's degree and past work experience as a bookkeeping specialist (Tr. 42).

### Medical record evidence

In February of 2016, Plaintiff was treated at CHRISTUS St. Michael emergency room for alcohol withdrawal (Tr. 578-79). Plaintiff presented with anxiety, shortness of breath, and a headache (Tr. 578).

Plaintiff presented to Collom & Carney Clinic for an appointment with Gregory A. Richter, M.D., on August 5, 2016 (Tr. 346-49). She complained of pain in her neck, left shoulder, and arm that had gradually worsened in the previous two weeks (Tr. 346). She advised the pain was so bad she could not sleep, and she also reported a long history of anxiety (Tr. 346). Symptoms also included numbness in the upper extremity (Tr. 347). It was noted that Plaintiff needed a refill of her medications and that she appeared to be doing well with her anxiety (Tr. 346). On examination, Dr. Richter noted Plaintiff had muscular tightness on the left, but she had good grip strength, interosseous strength, and peripheral pulses (Tr. 348). X-Rays of Plaintiff's cervical spine and left scapula showed mild degenerative changes (Tr. 350-51).

Plaintiff later presented to CHRISTUS St. Michael emergency room, complaining of pain in her neck, back, and shoulder (Tr. 572-74). She noted she was unable to turn her head (Tr. 572). The impression was degenerative disc disease and radiculopathy (Tr. 574).

Plaintiff reported to Neurological Associates of Texarkana on August 18, 2016, for an appointment with Brian K. Willis, M.D. (Tr. 448-51). Dr. Willis noted Plaintiff had been referred for evaluation of neck and left upper extremity pain (Tr. 448). He further noted Plaintiff had similar symptoms one and a half years prior but the symptoms had gradually gone away with conservative treatment and over-the-counter analgesics (Tr. 448). More recently, Plaintiff had two or three "flare-ups, this last one starting about a month" prior (Tr. 448). Plaintiff reported the pain was severe and radiated "through a point in the back of the shoulder and down the arm into the triceps, which is affected with fasiculations, before going down the forearm with some numbness and then pain and numbness involving the middle three digits." (Tr. 448). Dr. Willis noted this was "very classic for a left 6-7 radiculopathy." (Tr. 448). Plaintiff further reported hydrocodone and muscle relaxants did not provide adequate pain control (Tr. 448).

On examination, Dr. Willis noted "2+ biceps jerks but absent triceps jerks." (Tr. 448). Plaintiff had good strength in all muscle groups tested, but sensory examination was consistent with a left C7 hypesthesia (Tr. 448). According to Dr. Willis, the neck examination was unremarkable "though there was some limitation to range of motion as well as tenderness diffusely across the cape of the shoulder." (Tr. 448). Dr. Willis, having reviewed the cervical spine MRIs, noted "a moderately large left paracentral disc herniation to the left at C6-7, causing significant compression of the exiting left C7 nerve root." Dr. Willis further noted a CT scan showed minimal disc changes at C6-7 "but slight kyphotic deformity which was seemingly centered at the C5-6 level." (Tr. 448) (further noting that with the disc space looking normal, no bulging, and no degeneration, he did not think he would opt to do the C5-6 level). He discussed a cervical diskectomy and fusion, and Plaintiff wanted to proceed (Tr. 448).

Plaintiff presented for the procedure a week later. According to the Operative Report from CHRISTUS St. Michael, the diagnosis was C6-7 herniated nucleus pulposus (Tr. 456). There were no complications, and Plaintiff tolerated the procedure well (Tr. 457).

On October 20, 2016, Plaintiff presented to Dr. Willis for a post-operative follow up visit (Tr. 436-38). Dr. Willis noted Plaintiff was doing "quite well" six weeks "post C6-7 ACDF using cadaveric allograft and a Swift plate." (Tr. 436). Dr. Willis noted some slight residual numbness in Plaintiff's hand and advised that it would take some time to "ease off." Dr. Willis noted Plaintiff had a good range of motion and that she was able to resume full activities without difficulties (Tr. 436).

In January of 2017, Plaintiff returned to Dr. Richter with complaints of insomnia (Tr. 352-55). Plaintiff noted she was starting a new job in the next ten days and wanted something to help her insomnia (Tr. 352). Dr. Richter noted Plaintiff had a long history of anxiety, alcoholism, and insomnia (Tr. 352). On examination, Plaintiff was oriented to time, place, and situation; she had appropriate mood and affect; and she had normal insight and judgment (Tr. 354). Dr. Richter advised that Plaintiff continue her current medications, and he prescribed Belsomra for insomnia (Tr. 354).

In August of 2017, Plaintiff presented to Arklatex Assessments for a psychological assessment with David Grant, Ph.D. (Tr. 281-85). According to the Psychological Report – IQ and Mental Status, Plaintiff presented with sad and nervous attitude and behavior (Tr. 281). Her posture and gait were unremarkable. Plaintiff described being anxious and depressed daily "where she does not want to be around people as she gets overwhelmed and yet does not want to be alone." (Tr. 281). She described her anxiety attacks as follows: "she cries easily, has racing, thoughts, vomits, and that these occur daily for the past three years." (Tr. 281). Plaintiff admitted to suicidal

ideation but denied any current plans or intent, and she stated she would not harm herself (Tr. 281). She indicated her OCD had gotten worse since the last time she has seen Dr. Grant one year prior (Tr. 281).

Dr. Grant noted that Plaintiff was able to drive and could complete basic daily tasks such as cleaning, doing dishes and laundry, doing yard work, and caring for herself (Tr. 282). He noted Plaintiff has a business degree and last worked at a bank in 2015. Plaintiff advised of previously self-medicating with alcohol, but she reported she had not drank since November of 2016 (Tr. 282). Dr. Grant noted Plaintiff's speech was clear and she interacted appropriately throughout the course of the assessment; there was no evidence of tangential thinking or looseness of associations, but her abstract thinking was very poor (Tr. 282). Plaintiff's mood and affect were appropriate, and Plaintiff was oriented to time, date, and person (Tr. 283). Plaintiff's remote and immediate memory were both fair, and her concentration was good. Her judgment and insight appeared to be fair, and Plaintiff cooperated well with the testing process (Tr. 283). After interpreting the test results, Dr. Grant provided diagnoses of generalized anxiety disorder, panic disorder, OCD, and borderline intellectual functioning (Tr. 284). He concluded with the following prognosis:

> Ms. Stahl presents as a 49 year old Caucasian female functioning at a borderline level of intellectual functioning.
>
> Ms. Stahl is currently able to understand, carry-out, and follow instructions. It is not likely that she would respond appropriately to work pressure in a work setting due to ongoing anxiety issues. Her ability to tolerate stress associated with competitive work and make reasonable occupational adjustments is poor. She does appear to be able to manage funds without assistance.

(Tr. 285).

Plaintiff appeared at CHRISTUS St. Michael Health System emergency room on November 11, 2017, with complaints of severe headache and neck and jaw pain (Tr. 527-31). It was recommended that Plaintiff receive a spinal tap for more information, but she declined (Tr.

531). She was prescribed medications and released with instructions to return for any new or worsening symptoms and to follow up with her primary care physician (Tr. 532).

On March 29, 2018, Plaintiff reported to The Counseling Center for an initial assessment with Barbara Larry, LPC (Tr. 291-99). The presenting symptoms, stressors, and other concerns, as reported by Plaintiff, were as follows:

> OCD tendencies, anxiety, panic disorder. She has been prescribed Ativan in the past. Fear of impending doom[,] can't drive over bridges, don't drive on interstates or at night due to extreme anxiety. She had a nervous breakdown in April 2015 and was treated inpatient for 11 days @ Brentwood Hosp. Has used alcohol excessively in the past (wine) to self-medicate anxiety. Reported social isolation- limited family interactions.

(Tr. 291).

Plaintiff reported to Ms. Larry that she suffered chronic pain as follows: "neck, ruptured disc, shoulders, back, arms, permanent nerve damage in left arm." (Tr. 292). Plaintiff further reported an increase in anger or irritability associated with pain in the right side of her abdomen (Tr. 293). Plaintiff also described having racing thoughts, panic attacks, anxiety, and excessive worry, as well as problems staying focused (Tr. 293). Plaintiff reported she drank three bottles of wine per day until December of 2016, which was when she last used (Tr. 294). Ms. Larry found Plaintiff had normal posture/gait, motor activity, attention, concentration, orientation, and recall, but only fair judgment (Tr. 295-96). According to Ms. Larry, Plaintiff had normal eye contact and a cooperative attitude but presented with a flat affect and depressed mood (Tr. 296). Mr. Larry listed the following diagnoses: anxiety disorder, depressive disorder, and alcohol abuse (in remission) (Tr. 298).

In June of 2018, Ms. Larry completed a Mental Residual Functional Capacity Assessment, providing a fair prognosis (Tr. 287-90). Ms. Larry did not assign any marked or extreme ratings in understanding and memory; sustained concentration and persistence; social interaction; or

6

adaptation (Tr. 288-90). In the following areas, Ms. Larry described Plaintiff's functioning as moderate: ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pact without an unreasonable number or and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to respond appropriately to changes in the work setting; and ability to tolerate normal levels of stress (Tr. 289-90).

Plaintiff reported to an appointment with Dr. Richter on September 17, 2018 (Tr. 361-65). Plaintiff complained of right knee pain and explained she experienced a fall six weeks prior and another fall eight days prior to the visit (Tr. 361). Plaintiff reported the pain was worse with prolonged walking, but she did not have any locking or instability (Tr. 361). On examination, Dr. Richter noted Plaintiff had on a knee brace and that Plaintiff had mild edema and medial joint line tenderness (Tr. 363). Plaintiff was oriented to time, place, person, and situation and had appropriate mood and affect with normal insight and judgment (Tr. 363). Dr. Richter opined that Plaintiff had a cartilage tear and referred her for an orthopedic consultation (Tr. 364). Knee x-rays were taken (Tr. 364). The three views of Plaintiff's right knee showed the following:

> No fracture or dislocation. Moderate joint space narrowing of the medial compartment. No significant joint space narrowing of the lateral or patellofemoral compartments. No large joint effusion. An enthesophyte arises off the superior pole of the patella.

(Tr. 366). Dr. Richter advised Plaintiff to continue using the knee brace and to use cold for swelling and anti-inflammatories as needed (Tr. 364).

Plaintiff presented to Collom & Carney Clinic for an appointment with Darius F. Mitchell, M.D., on October 17, 2018 (Tr. 425-28). Plaintiff complained of right knee pain and tenderness (Tr. 425). Examination of the knee showed tenderness over the anterior middle and posterior

medial lateral joint line. Dr. Mitchell noted the x-rays showed osteoarthritic changes of the right knee (Tr. 425). Dr. Mitchell administered a steroid injection, which Plaintiff tolerated well (Tr. 425).

Plaintiff returned to Dr. Richter on November 1, 2018 (Tr. 313-15). Plaintiff reported chest discomfort and hand pain (Tr. 313). Plaintiff stated she had been evaluated the night before in the emergency room and had an EKG and lab work done (all of which were normal), but she left before she was fully evaluated (Tr. 313). Plaintiff also reported bilateral hand pain and numbness. The record provides as follows:

> It is worse in her right than her left hand. She had a significant fracture of her right wrist and has plates there, her anatomy is not normal. She was told that if she did develop carpal tunnel in her right wrist it would be difficult to fix. She does have some numbness in both hands. She has had neck issues in the past and has had a neck surgery previously as well.

(Tr. 313). An x-ray of Plaintiff's right wrist had the following findings:

> There is chronic deformity and irregularity of the distal radius consistent with old, healed fracture. There is some irregularity of the distal radial joint space. No acute fracture or dislocation is evident. Soft tissues are unremarkable.

(Tr. 320). Dr. Richter referred Plaintiff to an orthopedist for further evaluation (Tr. 319).

On February 11, 2019, Plaintiff reported to an appointment with Dr. Richter at Collom & Carney Clinic (Tr. 306-11). He noted Plaintiff had increased anxiety because of "familial and job stress." (Tr. 306). Dr. Richter was not comfortable increasing Plaintiff's Ativan to three times a day as requested and noted she ought to see a psychiatrist for further evaluation and treatment (Tr. 306). Plaintiff also reported persistent right knee and right hand pain and noted she was scheduled for left upper extremity nerve conduction velocities (Tr. 306).

The Nerve Conduction Study Interpretation by John E. Hueter, M.D., showed the following:

> This nerve conduction study of the upper extremities shows changes consistent with right carpel tunnel syndrome. Severity is mild by electrophysiologic criteria.

(Tr. 316). Dr. Richter sent Plaintiff correspondence dated February 14, 2019, noting a positive finding of carpel tunnel syndrome (Tr. 315).

On February 27, 2019, Plaintiff presented for an appointment with Dr. Mitchell (Tr. 410). He noted Plaintiff complained of right hand pain and numbness and continued right knee pain (Tr. 410). Examination of the right hand showed fullness in the first web space with no palpable subluxation of the extensor tendon; she had positive Tinel's, Phalen's, and digital compression over the carpal tunnel (Tr. 410). Plaintiff also had tenderness over the anterior middle and posterior medial and lateral joint line (Tr. 410). Dr. Mitchell's impression found osteoarthritis in the right knee, sagittal band rupture of the index to middle finger, and carpel tunnel syndrome of the right hand. He referred Plaintiff to Dr. Richard Wirges to evaluate her "saggital band, which [was] her biggest problem. . . ." (Tr. 410). Dr. Mitchell injected a steroid injection to address Plaintiff's knee pain (Tr. 410).

In July of 2019, Plaintiff appeared for a psychological evaluation at Associated Family Therapists with listed allegations of anxiety disorder, OCD, and panic attacks (Tr. 387-89). Plaintiff stated she feels like she is dying during her panic attacks, and much of her anxiety stems from apprehensiveness about her next attack (Tr. 387). Dr. Tom Wright noted Plaintiff had been prescribed Ativan and was still using it; however, Plaintiff stated "all the psychiatrists wanted to do was put me on antidepressants and that all made me sick." (Tr. 387). He added as follows: "Indeed, she seems pointedly dismissive of mental health professionals and treatments in general." He noted Plaintiff was alert, oriented, and in touch with immediate physical reality, but she was on the "glum side and a little cranky, possibly over having to be here, but [did] not exhibit melancholia, psychomotor showing, agitation, or tearfulness." (Tr. 387-88).

9

Plaintiff's speech was within normal limits in terms of coherence, appropriateness, and goal-directedness, and there were no identifiable obsessive or compulsive behaviors seen (Tr. 388). Plaintiff did report she was "quite meticulous about housekeeping and is accused of being an overplanner." (Tr. 388). Plaintiff reported she accomplished household chores like dishwashing, cooking, and doing laundry (Tr. 388). Dr. Wright's diagnostic impression included panic disorder, unspecified depressive disorder, and obsessive-compulsive disorder (Tr. 389). Dr. Wright provided a prognosis of guarded (Tr. 389).

On September 5, 2019, Matthew Turner, Ph.D., State Agency psychologist, prepared a mental residual functional capacity assessment (Tr. 64-71). Dr. Turner considered the "B" criteria of the Listings for 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.11 (neurodevelopmental disorders) (Tr. 70). He found Plaintiff had moderate limitations in the ability to understand, remember, or apply information; interact with others, concentrate, persist or maintain pace, and adapt or manage oneself (Tr. 70). According to Dr. Turner, although Plaintiff is somewhat limited by her psychiatric symptoms, the impact of those symptoms does not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis (Tr. 71). Upon reconsideration in January of 2020, Julian Lev, Ph.D., reviewed the evidence and confirmed the findings (Tr. 72-88).

Plaintiff returned to Dr. Richter in October of 2019 with multiple complaints (Tr. 398-402). Plaintiff noted fatigue, carpel tunnel pain, arm pain, sciatic symptoms, nerve pain, and muscle cramps. She noted she had an upcoming appointment with a hand specialist. Dr. Richter discussed rheumatoid factors and referred Plaintiff to a neurological consultation for her neuropathic pain (Tr. 401). He also advised Plaintiff to have a sleep study consultation for her untreated sleep apnea and noted "I think that was the thing that will make her better all around." (Tr. 401).

In March of 2020, Plaintiff reported to Dr. Richter with complaints of lymph swelling and joint pain (Tr. 413-17). Dr. Richter noted Plaintiff was sleeping better (Tr. 413). Plaintiff returned in June with complaints of worsening right hand pain (Tr. 418-22). Dr. Richter noted Plaintiff had been diagnosed with sagittal band syndrome and was scheduled to "see a surgeon in Little Rock but could not make that trip secondary to some increased anxiety." (Tr. 418). Dr. Richter further noted Plaintiff had seen an orthopedic surgeon in Shreveport and received a steroid shot which did not help; she was still experiencing "a good bit of pain at the base of her index finger on her right hand between her index finger and her middle finger." (Tr. 418). Dr. Richter noted that since Plaintiff had lost "a good bit of weight," her right knee pain had improved (Tr. 418).

A July 8, 2020 MRI of Plaintiff's right hand showed the following:

Mild heterogeneous signal and partial discontinuity of fibers of the ulnar collateral ligament of the second MCP joint suggestive of partial tear.

(Tr. 432).

Later in July 2020, Plaintiff presented to Dr. Richard Wirges of OrthoArkansas (Tr. 431). Plaintiff reported a hand injury eighteen months prior, which caused swelling and bruising at the time (Tr. 431). Plaintiff stated she treated it conservatively and it improved but never completely resolved. Plaintiff also reported a more recent injury, three weeks prior, causing her right hand to be painful and swollen at the time of the appointment (Tr. 431). Dr. Wirges took three views of the right hand which showed "no fracture dislocations to the second MCP joint and no arthritic changes." (Tr. 431). The views did show that Plaintiff had "posttraumatic changes of the distal radius and the distal ulna." (Tr. 431).

At a follow up appointment with Dr. Wirges, Plaintiff reported no depression, sleep disturbances, fatigue, numbness, or dizziness. Dr. Wirges reviewed the MRI with Plaintiff, and she decided to proceed with the repair of the ligament tear (Tr. 487).

On July 13, 2020, Plaintiff began treatment with Jeanne Field Miller, MS, LPC, LMFT, LDLC, NCC, at the Summerhill Counseling Center. On July 27, 2020, Ms. Miller prepared a Mental Residual Functional Capacity Assessment (Tr. 493-96). Ms. Miller provided the following diagnoses:

> Axis I: Panic Disorder, Major Depression, moderate
> Axis II: None
> Axis III: Torn ligament in hand, arthritis in knee, chronic abdomen wall, pain in IBSD, carpal tunnel syndrome
> Axis IV: Financial, social, family dysfunction
> Axis V: 45/45

(Tr. 493). Ms. Miller gave a poor prognosis and noted Plaintiff has stress and physical pain that may contribute to her mental impairment (Tr. 493).

Based on her personal assessment of Plaintiff, Ms. Miller opined Plaintiff has the following limitations:

I.   Understanding and Memory
a.   The ability to remember locations and work like procedures: Marked
b.   The ability to understand and remember very shot and simply instructions: Marked
c.   The ability to understand and remember detailed instructions: Extreme

II.   Sustained Concentration and Persistence
a.   The ability to carry out very short and simple instructions: Marked
b.   The ability to carry out detailed instructions: Extreme
c.   The ability to maintain attention and concentration for extended periods: Extreme
d.   The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance: Extreme
e.   The ability to sustain an ordinary routine without special supervision: Marked
f.   The ability to work in coordination with or proximity to others without being distracted by them: Marked
g.   The ability to make simple work-related decisions: Extreme
h.   The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform

at a consistent pace without an unreasonable number of and length of rest periods: Extreme.

III.   <u>Social Interaction</u>
a.   The ability to interact appropriately with the general public: Marked
b.   The ability to ask simple questions or request assistance: Moderate
c.   The ability to accept instructions and respond appropriately to criticism from supervisors: Extreme
d.   The ability to get along with co-workers o peers without distracting them or exhibiting behavioral extremes: Marked
[e].   The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: Marked.

IV.   <u>Adaptation</u>
a.   The ability to respond appropriately to changes in the work setting: Marked
b.   The ability to be aware of normal hazards and take appropriate precautions: Marked
c.   The ability to travel in unfamiliar places or use public transportation: Extreme
d.   The ability to set realistic goals or make plans independently of others: Marked
e.   The ability to tolerate normal levels of stress: Extreme.

(Tr. 494-96). Ms. Miller opined Plaintiff's impairments would substantially interfere with her ability to work on a regular and sustained basis at least 20% of the time (Tr. 496). According to Ms. Miller, Plaintiff cannot work on a regular and sustained basis in light of her mental impairment because her symptoms of depression and panic preclude an ability to work (Tr. 496).

In a September 14, 2020 letter from Ms. Miller to Plaintiff, Ms. Miller stated as follows:

Mrs. Stahl was admitted to my psychotherapy practice on July 13, 2020, related to depression, anxiety and panic attacks. Her symptoms are low self confidence, sadness, lack of concentration, worrisomeness, overwhelmed feelings, nervousness and restlessness. Her diagnosis is Panic Disorder and Major Depressive Disorder, Moderate. She attends individual therapy sessions every two weeks where in we are using cognitive behavioral therapy to de-escalate her symptoms. Her next scheduled appointment is October 13, 2020. Prognosis: Poor. Condition appears chronic.

(Tr. 586).

13

## THE HEARING

### *Plaintiff's testimony*

At the hearing, Plaintiff's counsel amended Plaintiff's onset date to February 18, 2018 (Tr. 40). Counsel stated Plaintiff suffers from chronic severe anxiety, depression, panic attacks, chronic neck pain, radicular arm pain, carpel tunnel-related symptoms, and fatigue (Tr. 40). According to counsel, Plaintiff is not able to sustain or maintain employment within the boundaries of the normal workday or workweek (Tr. 40).

Plaintiff testified she was fifty-two years of age (Tr. 41). Plaintiff lives with her husband, and she has two grown children. She noted she has not received any form of unemployment compensation and has no source of income. Her husband is employed (Tr. 41).

Plaintiff stated she has a driver's license, and she drives two or three times each week, depending on her anxiety (Tr. 41-42). According to Plaintiff, she has a bachelor's degree, and she last worked as a bookkeeping specialist in 2015 (Tr. 42). She testified she is no longer able to work because of anxiety and panic attacks (Tr. 43). When she last worked, she had multiple panic attacks a week, and oftentimes she would not be able to drive to work because she would "panic on the way to work" and have to pull over (Tr. 43). She stated she missed a lot of work and was not able to concentrate or keep up (Tr. 43). She stated she continues to have anxiety, panic attacks, and depression (Tr. 43-44).

Plaintiff testified she also has a torn ligament and carpel tunnel in her right hand (Tr. 44). She added her left hand is numb due to her previous neck surgery (Tr. 44). Plaintiff stated she was not able to do her previous job's requirement of data entry because of nerve pain and numbness in her hands. According to Plaintiff, after leaving her previous job, her doctors diagnosed her with a ruptured disc (Tr. 44). Although she had surgery, she still experiences muscle spasms (Tr. 44). She

also still experiences numbness and nerve issues in her hands, which makes it very difficult for her to do anything with her hands (Tr. 44-45).

Plaintiff states she sees Dr. Richter at Collom & Carney Clinic a couple of times a month (Tr. 45). She noted she was finally referred to a hand specialist and was diagnosed with a torn ligament (Tr. 45-46). Plaintiff advised she also sees a counselor, Jamie Miller, for anxiety, depression, OCD, and phobias (Tr. 46). Plaintiff stated she has had no recent hospitalizations, but she did undergo mental health inpatient treatment in 2015 after she left her last job (Tr. 48).

In relation to medication side effects, Plaintiff noted she takes Ativan, sometimes three times a day and sometimes more at night (Tr. 48). Plaintiff testified Ativan makes her tired and weak. She also noted her Toradol prescription for pain increases the sleepiness (Tr. 48).

Plaintiff testified she is able to sit for about ten minutes before needing to get up and stretch; however, sitting causes her neck to get really sore so she typically bends over a little while sitting (Tr. 49). She stated she is able to stand for ten to fifteen minutes and can walk ten to fifteen yards (Tr. 49-50). Plaintiff testified she can lift only three pounds because of the nerve condition in her arm, and she is not able to reach above her head on both sides, more on her right side (Tr. 50). She advised she is not able to stoop, crouch, kneel, or crawl (Tr. 50).

Plaintiff stated she also has problems with memory. She has a hard time remembering anything, and she was not able to remember all of the necessary procedures at her last job (Tr. 50-51). She stated she had no mental clarity and could not concentrate because of her anxiety and panic attacks (Tr. 51). According to Plaintiff, being in an unfamiliar environment causes her anxiety, so she does not go to new places (Tr. 51). Plaintiff noted she has difficulty making decisions, and her husband usually makes decisions for her (Tr. 52).

Plaintiff stated she stays isolated from other people (Tr. 52). Plaintiff further stated she cannot open containers or put heavy things in the oven because of the issues with her hands (Tr. 54). Plaintiff testified her husband cooks and cleans dishes, and her daughter comes over to help with household cleaning (Tr. 53). Plaintiff stated she can do a little laundry and can occasionally grocery shop on a "good day." (Tr. 54). She added that she does not drive on bridges or interstate highways because of her panic attacks (Tr. 55). Plaintiff stated she does not have any hobbies, and she does not have a normal sleep pattern because of her panic attacks during the night (Tr. 55-56). Plaintiff testified she also experiences knee or hand pain in the middle of the night (Tr. 56). Plaintiff stated the only time she rests is during the day (Tr. 57).

According to Plaintiff, she has tried different medications to try and better control her anxiety, but she did not have good reactions to those medications; the one she currently takes is the only one that helps calm her down (Tr. 57).

### Vocational expert testimony

A vocational expert also testified at the hearing (Tr. 58). The vocational expert characterized Plaintiff's past work as follows: (1) accounts payable - SVP 6 and sedentary exertional level; (2) administrative assistant - SVP 7 and sedentary exertional level; (3) accounting clerk - SVP 5 and sedentary exertional level; (4) executive assistant - SVP 7 and sedentary exertional level; and (5) human resources generalist - SVP 8 and sedentary exertional level (Tr. 59).[1]

The ALJ asked the vocational expert to consider a person with Plaintiff's age, education, and work history who would be limited to medium exertion work (Tr. 59). The hypothetical person would be able to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently;

---

[1] Specific vocational preparation (SVP) refers to the amount of time it takes a person to learn a specific job.

could sit, stand, or walk for six hours in an eight-hour workday; no limits on the ability to push and/or pull within the weight limits for lifting and carrying; limited to frequent handling with the right hand; limited to frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds; could frequently kneel, crouch, and crawl; limited to the performance of simple, routine tasks, simple work-related decision making, and occasional interaction with the public (Tr. 59-60). The vocational expert testified the person would not be able to perform any of Plaintiff's past work; however, there would be other jobs available in the economy the person could perform (i.e., dietary aide, dishwasher, and cook helper) (Tr. 60).

For the second hypothetical, the ALJ limited the hypothetical person to light exertion work (Tr. 60). The hypothetical person would be able to lift and/or carry twenty pounds occasionally and ten pounds frequently; could sit, stand, or walk for six hours in an eight-hour workday; no limits on the ability to push and/or pull within the weight limits for lifting and carrying; limited to frequent use of hand controls on the right and on the left and frequent handling and fingering bilaterally; limited to occasional climbing of ramps and stairs and no climbing of ladders, ropes, and scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; limited to the performance of simple, routine tasks, simple work-related decision making, and occasional interaction with the public (Tr. 60-61). The vocational expert testified there would be jobs available in the national economy the person could perform (i.e., drycleaner, office helper, and mailroom sorter) (Tr. 61).

According to the vocational expert, if the hypothetical person could only have occasional handling, feeling, and fingering in the hands, all jobs would be eliminated (Tr. 62). The vocational expert also noted additional breaks and absenteeism more than one day a month on a regular and consistent basis would eliminate all competitive employment (Tr. 62).

## __APPLICABLE LAW__

### *Standard of review*

In an appeal under § 405(g), the Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995), and conflicts in the evidence are resolved by the Commissioner, *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

### *Entitlement to benefits*

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *Plaisance v. U.S. Comm'r, Soc. Sec. Admin.*, Civil Action No. 6:18-CV-00033, 2019 WL 2608884, at *14 (W.D. La. May 13, 2019), *report and recommendation adopted sub nom. Plaisance v. U.S. Comm'r*, No. 6:18-CV-00033, 2019 WL 2607498 (W.D. La. June 25, 2019) (citing 42 U.S.C. § 423(a)). The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(a)(1) & (2)).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(A)). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(B)).

### *Sequential evaluation process and burden of proof*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520 (2012). First, a claimant who, at the time of his disability claim, is engaged in substantial gainful employment is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2012). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(a)(4)(ii) (2012). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 (2011). 20 C.F.R. § 404.1520(a)(4)(iii) (2012). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(a)(4)(iv) (2012). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v) (2012). If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated. *Audler*

*v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir.1987)).

Under the first four steps of the sequential analysis, the burden lies with the claimant to prove disability. *Audler,* 501 F.3d at 448. If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical–Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir.1987). However, this process is used only when an initial determination of disability is being evaluated, not when a claimant is already receiving disability benefits. *See* 20 C.F.R. § 404.1520(a)(5). The Code explicitly states, "If you are already receiving disability benefits, we will use a different sequential evaluation process to decide whether you continue to be disabled. We explain this process in § 404.1594(f)." *Id*.

## THE ALJ'S FINDINGS AND CONCLUSIONS

Applying the sequential evaluation, the ALJ found Plaintiff had not engaged in substantial gainful activity from the date of alleged onset, February 1, 2018, through her date last insured, March 31, 2020 (Tr. 13). The ALJ found Plaintiff had the following severe impairments: osteoarthritis, carpel tunnel syndrome, panic disorder, depressive disorder, and obsessive-compulsive disorder (Tr. 13). The ALJ then determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (Tr. 14-16).

After considering the record, the ALJ found Plaintiff had the residual functional capacity to perform work at the medium work with limitations (Tr. 16). The ALJ noted Plaintiff was limited to frequent handling with her right hand, limited to frequent climbing of ramps and stairs, occasional climbing of ladders, ropes or scaffolds and frequent kneeling, crouching and crawling. She was limited to performing simple, routine tasks, with simple work-related decision-making, and occasional interaction with the public (Tr. 16).

The ALJ determined Plaintiff was not able to perform any of her past work (Tr. 28). Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found there were jobs that existed in significant numbers in the national economy that she could perform (dietary aide, dishwasher, cook helper) (Tr. 29).  The ALJ found Plaintiff was not under a disability, as defined in the Act, at any time from her alleged onset date through the date last insured (Tr. 30).

## DISCUSSION AND ANALYSIS

The overarching issues are whether substantial evidence of record supports the Commissioner's decision that Plaintiff was not disabled during the relevant period, and whether the ALJ applied the correct legal standards in reaching that decision. Having reviewed the parties' briefs, the Court notes the following specific issues on appeal: (1) whether the ALJ erred in finding Plaintiff able to perform medium work despite objective evidence of limitations with her hands and right knee; and (2) whether the ALJ properly considered the opinions of Plaintiff's therapist and licensed counselor in assessing Plaintiff's mental impairments.

In her first assertion of error, Plaintiff asserts the ALJ referred to medical records from her primary care provider, Gregory Richter, M.D., and from her orthopedic surgeon, Darius Mitchell, M.D., regarding the problems she has with her right knee and both hands. According to Plaintiff,

the ALJ erroneously found her symptoms were not as severe as alleged and that she did not have persistent limitations. Dkt. No. 16 at 8. Plaintiff relies on her own testimony at the hearing as well as findings from specialist, Dr. Richard Wirges of OrthoArkansas. *Id*. at 11. Plaintiff argues the ALJ chose to ignore the findings of limitations in the use of Plaintiff's hands, as well as the limitations with her chronic right knee pain. *Id.* at 14. Plaintiff points out the vocational expert testified that if the hypothetical limited the hypothetical person to occasional use of both hands, that limitation would eliminate all available work. *Id*. at 13-14.

In her second assertion of error, Plaintiff contends the ALJ erred in her assessment of Plaintiff's mental impairments. At step three, after finding Plaintiff's impairments did not meet any listed impairment under Listings 12.02, 12.04, 12.06, and 12.11, the ALJ assessed Plaintiff's residual functional capacity, wherein, among other things, Plaintiff was limited to performing simple, routine tasks, with simple work-related decision-making, and occasional interaction with the public. Plaintiff relies on the opinions of her counselor, Jeanne Miller, and of David Grant, Ph.D., as well as her own testimony regarding her mental limitations. Dkt. No. 16 at 16-21. Plaintiff argues the ALJ did not adequately discuss Plaintiff's mental limitations in the residual functional capacity determination. *Id.* at 26.

In its response, the Commissioner first asserts the ALJ properly considered all of the evidence and found that Plaintiff's right knee osteoarthritis and right hand carpal tunnel syndrome, although severe, did not cause disabling functional limitations. Dkt. No. 18 at 1. According to the Commissioner, physical examinations during the relevant period showed unremarkable right knee and hand findings and a lack of treatment one would expect for someone with disabling knee and hand impairments. *Id*. The Commissioner further contends the ALJ included in the residual

functional capacity assessment postural and manipulative limitations that sufficiently accounted for the functional deficits supported by the record. *Id.*

Regarding the ALJ's assessment of Plaintiff's mental limitations, the Commissioner asserts Plaintiff sought specialized mental health care only a handful of times during the first few months of the relevant period and did not seek further specialized treatment until establishing care with a different therapist several months after her insured status expired. *Id.* According to the Commissioner, "Plaintiff appears to complain that the ALJ did not defer to a mental health provider who did not even meet Plaintiff until several months after the relevant period and opined that Plaintiff had marked or extreme limitations in almost every area."[2] *Id.* The Commissioner states relevant mental status examinations throughout the record show normal memory, concentration, and judgment. *Id.* at 1-2. Additionally, the Commissioner asserts the ALJ included mental and social restrictions in the residual functional capacity assessment, and Plaintiff has not provided persuasive evidence that she had greater limitations. *Id.* at 2.

Within both claims for relief, Plaintiff asserts the ALJ erred in her assessment of Plaintiff's residual functional capacity. Residual functional capacity is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's residual functional capacity should be based on all of the relevant evidence in the case

---

[2] To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status. *Oden v. Comm'r of Soc. Sec.*, No. 6:21CV284, 2022 WL 1645079, at *2 (E.D. Tex. May 23, 2022) (citing *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982)). Plaintiff's date last insured was March 31, 2020 (Tr. 13). Plaintiff began treatment with Ms. Miller on July 13, 2020 (Tr. 493-96).

record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's residual functional capacity decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Jodie C. v. Berryhill,* Civil Action No. 3:18-CV-1687-S-BH, 2019 WL 3101689, at *16 (N.D. Tex. May 7, 2019), *report and recommendation adopted*, No. 3:18-CV-1687-S, 2019 WL 3081538 (N.D. Tex. July 15, 2019) (citation omitted).

Here, after reviewing the evidence of record, the ALJ determined Plaintiff retained the residual functional capacity to perform work at the medium work with limitations with manipulative and postural limitations (Tr. 16). The ALJ noted Plaintiff was limited to frequent handling with her right hand, limited to frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, or scaffolds and frequent kneeling, crouching, and crawling. The residual functional capacity assessment also included social and mental limitations. As noted above, the ALJ limited Plaintiff to performing simple, routine tasks, with simple work-related decision-making, and occasional interaction with the public (Tr. 16).

As pointed out by the Commissioner, the ALJ engaged in a detailed discussion of the evidence she considered in assessing Plaintiff's residual functional capacity that spans twelve single-spaced pages (Tr. 16-28). The ALJ first set forth in detail Plaintiff's hearing testimony regarding her symptoms (Tr. 17-18). The ALJ acknowledged Plaintiff's testimony that she had a torn ligament and carpal tunnel syndrome in her right hand, and pain and numbness in her left hand, which rendered her unable to perform her last job as a bookkeeper (Tr. 17-18). The ALJ noted that Plaintiff claimed "difficulty doing anything with her hands." (Tr. 17). Plaintiff also indicated that she could not lift more than three pounds or reach overhead with her right hand (Tr. 18). Regarding her right knee arthritis, the ALJ acknowledged Plaintiff's testimony that her knee pain caused difficulty sitting, standing, walking (Plaintiff testified she could only walk ten to fifteen yards, though she stated she did not actually know how long a yard is), and alleged a complete inability to stoop, crouch, kneel, or crawl (Tr. 17-18).

The ALJ then found, among other things, as follows:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

With regard to her physical impairments, the relevant medical evidence of record, discussed and summarized below, provides only limited support for her testimony, and tends to suggest that the claimant's symptoms were not as severe, persistent or limiting as she has alleged during the relevant period between February 1, 2018, her alleged disability onset date, and March 31, 2020, her date last insured.

(Tr. 18).

Plaintiff's first complaint of hand problems during the relevant period was at a November 2018 visit with her primary care physician, Gregory A. Richter, M.D. This was nine months after her alleged onset date. Plaintiff had a prior right wrist fracture and in November 2018, reported numbness in both hands, worse on the right. Dr. Richter noted decreased grip strength bilaterally and a reduced range of motion in the right hand in November 2018 and February 2019.

A February 2019 nerve conduction study showed only mild carpal tunnel syndrome of the right hand and was otherwise unremarkable. When Plaintiff complained of right hand numbness to orthopedist Darius F. Mitchell, M.D., two weeks later, Dr. Mitchell assessed sagittal band rupture and referred Plaintiff to Richard Wirges, M.D., an orthopedic hand surgeon, for evaluation. Dr. Mitchell did not assess any functional limitations. Plaintiff did not contact Dr. Wirges for over one year.

The Fifth Circuit has consistently held that a failure to follow through with recommended treatment suggests that the claimant did not regard the condition as causing significant or disabling functional limitations. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1303 (5th Cir. 1987). Examination findings at appointments in April, September, and October 2019, and March 2020 were unremarkable for carpal tunnel-related limitations. The ALJ also noted that during Plaintiff's initial visit with Dr. Wirges in June of 2020, Plaintiff reported that her right hand symptoms had improved prior to reinjuring it a few weeks earlier (Tr. 20). Even

26

so, the ALJ included in the residual functional capacity assessment a limitation to frequent, rather than constant, handling (Tr. 16).

With respect to Plaintiff's right knee complaints, a September 2018 x-ray showed moderate joint space narrowing in the right knee. However, at a visit the same day, Dr. Richter noted only mild edema (swelling) and tenderness. Dr. Mitchell administered a steroid injection in October of 2018, after which Plaintiff made no further complaints of knee pain for three months, denying musculoskeletal issues at several visits in October and November. Dr. Mitchell administered a second steroid injection in February of 2019, after which Plaintiff sought no further treatment for knee pain from Dr. Mitchell or any other provider during the relevant period. The Commissioner asserts this suggests Plaintiff was not experiencing disabling symptoms during that time Subsequent examinations in April, September, and October 2019, and March 2020 were unremarkable for knee-related limitations. The evidence of record suggests the injections sufficiently alleviated Plaintiff's knee pain, and while Plaintiff had an osteoarthritis diagnosis, that diagnosis did not cause limitations to the extent Plaintiff alleged.

Plaintiff's argument that the ALJ did not properly consider her hand and knee impairments in assessing her residual functional capacity relies largely on mere diagnoses, Plaintiff and her husband's subjective assertions, and several records from outside the relevant period.[3] As urged by the Commissioner, diagnoses and subjective complaints are insufficient to establish disability. *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). What is more, the ALJ did not ignore these records but rather considered them in detail in her opinion. The ALJ recognized that Plaintiff had right knee osteoarthritis and right hand

---

[3] Plaintiff also relies on an October 2018 finding that her right knee range of motion was decreased. According to the Commissioner, the finding was that Plaintiff had a right knee range of motion of "5 to 120," which is only mildly decreased, and is sufficient for most functional activities. *See* Dkt. No. 18 at 8, n. 2 (citing Dkt. No. 16 at 9).

carpal tunnel syndrome diagnoses that could be reasonably expected to produce the alleged symptoms. However, the ALJ determined the evidence as a whole, which showed mild findings and a lack of treatment, did not support extreme alleged limitations such as an inability to hold a pen or walk more than fifteen yards (Tr. 15-21). The ALJ accounted for supported hand and knee limitations by including postural and manipulative restrictions in the residual functional capacity assessment. Importantly, Plaintiff has not shown that her conditions prevent her from being able to perform this range of work. *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000) (once the Commissioner shows a claimant can perform work existing in significant numbers at step five, the burden shifts back to the claimant to show that she cannot perform the work).

In her second contention, Plaintiff asserts the ALJ failed to properly evaluate her mental impairments in assessing her residual functional capacity. With regard to Plaintiff's mental impairments, the ALJ determined the relevant medical evidence of record provided only limited support for Plaintiff's testimony and tends to suggest that her symptoms were not as severe, persistent, or limiting as she has alleged during the relevant period from February 1, 2018, her alleged disability onset date, through March 31, 2020, her date last insured (Tr. 21).

Specifically, Plaintiff argues the ALJ did not give sufficient weight to the statements of her therapist, Jeanne Field Miller, M.S., L.P.C. Dkt. No. 16 at 18-21. The Commissioner points out in its response that Ms. Miller only began treating Plaintiff on July 13, 2020, several months after Plaintiff's date last insured. On July 27, 2020, after knowing Plaintiff for two weeks, Ms. Miller completed a "Mental Residual Functional Capacity Assessment" indicating that Plaintiff's depression and panic had marked or extreme limitations in all but one area and "preclude[d her] ability to work." (Tr. 493-96). The ALJ specifically considered this opinion but found it unpersuasive (Tr. 27). The ALJ noted Ms. Miller did not support her opinions of marked and extreme limitations with references to clinical findings made during the relevant period. The ALJ

further noted "Ms. Miller did not even begin treating the claimant until well after the claimant's date last insured. . . ." (Tr. 27). *See* 20 C.F.R. § 404.1520c(b)(2), (c) (the treatment relationship, supportability, and consistency are among the factors an ALJ will consider when evaluating medical opinions, with supportability and consistency being the most important factors).  The ALJ concluded as follows in this regard:

> Moreover, with regard to this period, her opinion seems grossly overly restrictive in light of the relevant medical evidence of record, which, as discussed above, shows that the claimant received psychotherapy from Ms. Larry between March and June 2018, but otherwise documents no efforts by her to seek treatment from any mental health specialists during this period, and shows that the claimant's mental status examinations were relatively benign. For the foregoing reasons, the undersigned found Mr. Miller's opinion unpersuasive.

(Tr. 27).

The ALJ noted earlier in her opinion that, other than receiving counseling from Barbara Larry, L.P.C., a handful of times between March and June 2018, Plaintiff sought no mental health treatment, and required no inpatient mental health treatment, during the relevant period (Tr. 22, 26). In March of 2018, Ms. Larry described Plaintiff as cooperative and neatly dressed and groomed, with fair judgment and normal eye contact, attention, concentration, and recall (Tr. 26).

In June of 2018, Ms. Larry completed a Mental Residual Functional Capacity Assessment, providing a fair prognosis (Tr. 287-90). Ms. Larry did not assign any marked or extreme ratings in understanding and memory; sustained concentration and persistence; social interaction; or adaptation (Tr. 288-90). In the following areas, Ms. Larry described Plaintiff's functioning as moderate: ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pact without an unreasonable number or and length of rest periods; ability to accept instructions and respond appropriately to

criticism from supervisors; ability to response appropriately to changes in the work setting; and ability to tolerate normal levels of stress (Tr. 289-90).

In July of 2019, consultative examiner, Tom Wright, Ph.D., noted that Plaintiff had low-average intellectual ability and performed well on memory and concentration tests, followed the conversation well, reacted sensibly to instructions, responded coherently to questions, and exhibited no socially alarming behaviors or verbal expressions (Tr. 26). Additionally, Plaintiff's primary care providers indicated at visits throughout the relevant period that she exhibited an appropriate mood and affect, normal insight and judgment, and normal memory.

The ALJ also found persuasive the prior administrative findings of State agency psychologists Matthew Turner, Ph.D., and Julian Lev, Ph.D. (Tr. 25). On September 5, 2019, having reviewed the above unremarkable mental status findings, Dr. Turner opined that Plaintiff could understand, remember, and carry out simple instructions; make basic decisions; attend and concentrate for extended periods; interact with others; accept instructions; and respond to changes in a routine work setting. Julian Lev, Ph.D., reviewed the evidence and confirmed this finding at the reconsideration level on January 14, 2020. The ALJ discussed these findings in detail and found these expert opinions were supported by, and consistent with the evidence (Tr. 25). The ALJ incorporated their mental limitations in the residual functional capacity assessment.

The ALJ also considered Plaintiff's daily activities in evaluating her mental impairments (Tr. 28). *See Leggett v. Chater*, 67 F.3d 558, 565 n. 12 (5th Cir. 1995) (daily activities are relevant to the disability determination). Plaintiff indicated in her May 2019 Function Report that she was able to socialize with family, shop in stores, drive, and use a computer (Tr. 15), activities that are inconsistent with Ms. Miller's opinion that Plaintiff had marked to extreme limitations in interacting with others and maintaining concentration, persistence, or pace. Plaintiff also reported

30

to Dr. Wright at her July 2019 consultative examination that, despite her impairments, she remained capable of daily activities such as cooking, washing dishes, and doing laundry (Tr. 15). The Court finds without merit Plaintiff's argument that the ALJ did not properly consider her mental impairments in assessing her residual functional capacity.

In sum, the Supreme Court has recently reiterated how deferential the substantial evidence standard is to the ALJ's decision, noting as follows:

> The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. *T-Mobile South, LLC v. Roswell*, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.' . . . It means—and means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Here, the Court finds the ALJ properly considered the evidence and substantial evidence supports her residual functional capacity determination.

## **RECOMMENDATION**

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot fund substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget v. Chater*, 67 F.3d 558, 565-66 (5th Cir. 1995). Having reviewed the record, the Court determines that the record shows that the Administration correctly applied the applicable legal standards and that

substantial evidence supports the Administration's determination that Plaintiff is not disabled. Accordingly, it is

**RECOMMENDED** the above-entitled Social Security action be **AFFIRMED.**

<u>Objections</u>

Within fourteen (14) days after service of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court, except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriquez v. Bowen*, 857 F.2d 275, 267-77 (5th Cir. 1988).

SIGNED this the 16th day of August, 2022.


J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE